## IN THE UNITED STATES DISTRICT OF COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>For the use and benefit of AMERICAN )<br>CABLING COMPANY )<br>551 Commerce Dr., Ste B )<br>Upper Marlboro, MD 20774 )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>HERMOSA CONSTR. GRP, LLC )<br>1325 G Street NW, Ste 500 )<br>Washington, DC 20005 )<br>and )<br>)<br>THE HANOVER INS. CO. )<br>440 Lincoln Street )<br>Worcester, MA )<br>)<br>    Defendants. )<br>_____ ) | Civil Action No._____ |

### COMPLAINT

COMES NOW Plaintiff, American Cabling Company ("Plaintiff" or "ACC") through undersigned counsel, pursuant to 40 U.S.C. §3131 of the United States Code, and files this complaint (the "Complaint") against Defendant Hermosa Construction Group, LLC ("Hermosa") and The Hanover Insurance Company ("Surety"). In support whereof, Plaintiff states as follows:

### JURISDICTION

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the provisions of the Miller Act, 40 U.S.C. § 3133(b)(3)(B). This Court has pendant and supplemental jurisdiction over the state law claims set forth by Plaintiff in the Complaint pursuant to 28 U.S.C. § 1367.

## VENUE

2. All construction and renovation services provided under the contract at issue in this case were performed in the District of Columbia. Venue therefore lies in the United States District Court for the District of Columbia pursuant to 40 U.S.C. § 3133(b)(3)(B) and 28 U.S.C. § 1391(b)(2).

## PARTIES

3. Plaintiff ACC is a corporation organized and existing under the laws of the State of Maryland with its principle place of business in Upper Marlboro, Maryland.

4. Hermosa is a corporation organized and existing under the laws of the State of Tennessee with its principle place of business in Atlanta, Georgia.

5. Surety is a corporation organized and existing under the laws of the State of Massachusetts, with its principle place of business in Worcester, Massachusetts.

## STATEMENT OF FACTS

6. On or about April 3, 2012, Defendant Hermosa entered into contract with the US Agency for International Development ("USAID") identified as Contract No. GS-11P-12-MKC-0017 for construction renovation services at USAID's headquarters located at 1300 Pennsylvania Avenue, NW, Washington, DC 20523 (the "Prime Contract").

7. On April 4, 2012, Hermosa obtained a Miller Act payment bond (the "Bond") from Surety in the amount of $3,255,965.00. Pursuant to the terms of the bond, Surety agreed to be bound "jointly and severally with" Hermosa for all payments due to Hermosa subcontractors who furnished labor and/or material to Hermosa in its prosecution of the work required under the Prime Contract in the event of Hermosa's failure to make prompt payment to any such subcontractor.

8. On or about December 11, 2012, Hermosa executed Purchase Order No. 020 (Job No. 01-11-1020) (the "Subcontract") to furnish labor, materials, equipment and other services necessary to install a secure passive optical network, as required by the Prime Contract. **Exhibit 1.**

9. The Subcontract expressly provides that "Payment of ACC invoices by Hermosa are directly related to funding of said invoices by GSA through Hermosa's contract GS#11P-12-MKC-0017 [Prime Contract] and its payment provisions."

10. The November 13, 2012 proposal incorporated by reference into the Subcontract provides for "Progress Billing". Also, prior to execution of the Subcontract, Hermosa orally agreed to pay ACC within fifteen (15) days of receipt of any invoice presented. Plaintiff relied upon this representation before commencing work on the project.

11. Upon information and belief, shortly after execution of the Subcontract in November 2012, USAID delivered all funds necessary to cover the costs associated with the Subcontract to Hermosa.

12. In a conversation with ACC CEO Timothy Matthews on February 7, 2013, Hermosa Controller, Steve Farrier, admitted that Hermosa had already spent the funds previously paid to Hermosa by USAID for the Subcontract to cover other expenses.

13. As of the date hereof, Hermosa has failed to pay ACC the total amount of $89,752.35 as per ACC's final invoice #4223 dated February 11, 2013, which amount was due 15 days later on February 26, 2012.

14. ACC completed its work on the contract on or before February 22, 2013, all of which was, pursuant to the express terms in the Subcontract, furnished pursuant to and in furtherance of the Prime Contract.

15. On February 25, 2013, Hermosa Controller, Steve Farrier, distributed an email in which he admits that Hermosa's own "missteps and inefficiencies" left the company with a "substantial payable deficit." **Exhibit 2**

## COUNT I
### *(MILLER ACT PAYMENT BOND)*

16. Plaintiff repeats and re-alleges paragraphs 1 through 15 above as though fully set forth herein and, further, states that:

17. Surety is obligated, pursuant to the Bond, to pay ACC for the labor, materials and services it furnished in the prosecution of the work provided for in the Prime Contract, and for which Hermosa has failed to make payment.

18. Surety has failed to fulfill its obligation under the Bond to pay ACC for labor, materials and services furnished in the prosecution of the work provided for in the Prime Contract, and for which Hermosa failed to make payment.

19. ACC is therefore entitled to payment from Travelers pursuant to the Miller Act, 40 U.S.C. §3133.

## COUNT II
### *(BREACH OF CONTRACT)*

20. Plaintiff repeats and re-alleges paragraphs 1 through 19 above as though fully set forth herein and, further, states that:

21. Plaintiff has performed all of its obligations under the Subcontract.

22. Hermosa has breached the Subcontract in that it has failed and refused to pay Plaintiff in full for labor, services, and materials furnished in the prosecution of the Subcontract and in furtherance of the Prime Contract.

23. Plaintiff has suffered damages as a direct and proximate result of Hermosa's breach of contract.

## COUNT III
### *(QUANTUM MERUIT)*

24. Plaintiff repeats and re-alleges paragraphs 1 through 23 of above as though fully set forth herein and, further, states that:

25. Plaintiff provided valuable labor, services and material that were necessary for Hermosa to perform and complete its obligations under the Prime Contract.

26. Hermosa benefitted from Plaintiff's labor, services and materials because, among other reasons, Hermosa could not have fully performed and completed its obligations under the Prime Contract in the absence of the labor, services and materials that Plaintiff provided under the Subcontract.

27. Notwithstanding that USAID had already delivered the funds to Hermosa to pay Plaintiff, Hermosa has failed and refused to pay Plaintiff for the labor, services and materials referenced hereinabove.

28. As a result, Plaintiff has suffered damages and Hermosa has been unjustly enriched as a result of Hermosa's failure to pay Plaintiff for the labor, materials and services it provided.

**WHEREFORE,** Plaintiff demands judgment against defendants Hermosa and Surety as follows:

    a.    Damages in the amount of $89,752.35;

    b.    Costs of the suit incurred herein;

    c.    Reasonable attorney's fees; and

    d.    Such other and further relief as the Court may deem just and proper.

Dated: December 13, 2013

Plaintiff Demands a Jury Trial

                                      Respectfully submitted,

                                      Reginald J. Richter, Esq.
                                      Bar No. 983822
                                      1101 15th Street, NW
                                      Suite 910
                                      Washington, DC 20005
                                      (202)494-8566
                                      (301) 560-5323
                                      rrichter@rlgdc.com
                                      *Attorney for Plaintiff*

Plaintiff Demands a Jury Trial

Exhibit 1



# PURCHASE ORDER

**Project: USAID Mobility Design Lab**

| | |
|---|---|
| **SUPPLIER:** American Cabling Company<br>551 Commerce Drive, Ste B Upper Marlboro MD 20774 | **PO NO.** 020 |
| **CONTACT:** Tim Matthews | **DATE** December 11, 2012 |
| **PHONE:** 301-390-2774 | **JOB NO.** 01-11-1020 |
| **FAX/EMAIL:** timothy.matthews@americancabling.com | **CHANGE ORDER NO.** |
| **Jobsite Address:** USAID | **COST CODE** 16.46054 |

1300 Pennsylvania Avenue, NW 7th floor

**CITY/STATE/ZIP:** Washington, DC 20004

| Quantity | Unit Measure | Description | Cost Per Unit | Total Cost |
|---|---|---|---|---|
| 1 | LS | This purchase order shall service as the administrative and procurement vehicle for America Cabling Company (ACC) to furnish and install a secure passive optical network per the proposal and statement of work developed by American Cabling Company dated November 13, 2012 and accepted by Bruce Wierzichowski of USAID (6 pages in total and attached for reference).<br><br>Hermosa Construction Group, LLC advised GSA (General Services Administration) and USAID that all work, equipment and warranties related to this scope requested, reviewed, approved and accepted by USAID would be the responsible of USAID and American Cabling Company to oversee and execute. Any issues, deficiencies or discrepancies revolving the work installed with the 7th floor space under construction by Hermosa Construction Group shall be resolved between ACC and USAID without financial impact or liability to Hermosa.<br><br>Payment of ACC invoices by Hermosa are directly related to funding of said invoices by GSA through Hermosa's contract GS#11P-12-MKC-0017 and its payment provisions.<br><br>The installation of this scope of work shall be independent of Hermosa's contract schedule requirements with GSA but in accordance with | $89,752.35 | $89,752.35 |

| | | | | |
|---|---|---|---|---|
| | | any agreement ACC has made with USAID directly. | | |
| | | Vendor shall provide a certificate of insurance per the attached Exhibit D Sample ACORD Insurance Certificate. | | |
| | | SUPPLIERS SALES TAX NUMBER FOR THE STATE IN WHICH THIS JOB IS LOCATED: | | |
| GUARANTEED DELIVERY DATE: | | | | |

|   |   |
|---|---|
| TOTAL THIS ORDER............ | $89,752.35 |
| PREVIOUS P.O. AMOUNT......... | $0 |
| PURCHASE ORDER TO DATE.... | $89,752.35 |

PLEASE SIGN AND RETURN THIS COPY WITHIN 5 DAYS OF RECIEPT OR PURCHASER MAY, AT HIS OPTION, CANCEL THE AGREEMENT.

COMPANY  American Cabling Co.

BY:  Timothy Matthew Smith

TITLE:  President    DATE: 12/11/12

HERMOSA CONSTRUCTION GROUP
CONTRACTOR / PURCHASER

BY: _____
TITLE: CEO
DATE: 12/11/12

THE TERMS AND CONDITIONS OF THIS PURCHASE ORDER SET FORTH ON THE REVERSE SIDE HERETO ARE INCORPORATED HEREIN BY REFERENCE TO THE SAME EXTENT AS IF FULLY SET OUT ON THE FACE OF THIS PURCHASE ORDER

## TERMS AND CONDITIONS

1. Vendor shall identify and save harmless purchaser and/or owner for all costs whatsoever involved in any and all claims or suits for infringements of patent, patent rights or copy rights claimed to govern vendor's processes, products, items, equipment, apparatus, appliances, designs, plans, and specifications.

   Purchaser and/or owner shall give vendor reasonable notice of any such claim or suit and vendor shall undertake at his own expense the defense of any and all such claims or suits.

2. By accepting this order, vendor warrants, in addition to all warranties, that the items and services to be furnished hereunder shall be new, unless otherwise specified, and free from defect in design, materials, workmanship and title and shall conform to purchaser's and/or owner's specifications, drawings, and data and shall be fit and safe for the use intended by purchaser and/or owner. Acceptance of the order shall constitute an agreement on vendor's part to indemnify and hold purchaser and/or owner harmless from all claims, liabilities, loss, damage or expenses incurred or sustained by purchaser and/or owner by reason or any breech of such warranty. All warranties shall survive any inspection, delivery, acceptance, or payment.

3. Vendor shall provide a warranty for all material and/or equipment furnished hereunder for the period required in the plans and specifications referred to above, but in no case for less than one year form the date of final acceptance by purchaser and/or owner.

4. Time is of the essence in the performance of this work, and the delivery of items must be accomplished within the time promised. Delay in the performance of this agreement or any part thereof, will delay the completion of the project. Vendor hereby agrees to indemnify the purchaser and/or owner from any and all expenses and losses and hold him harmless against any claims, penalties and damages resulting from delays in the performance of this agreement.

5. Should the vendor refuse or neglect or in any way fail to perform in accordance with terms of this agreement, the purchaser and/or owner reserves the right, without liability, in addition to its other rights and remedies, to terminate this contract, by notice, effective when received by vendor as to stated items not yet shipped or services not yet rendered, and to purchase substitute items or services elsewhere and charge vendor with any loss or additional cost incurred. Vendor shall not be liable for damages and cost resulting from delay caused by any unforeseen occurrence beyond the control and without the fault of vendor if vendor notifies purchaser in writing within 48 hours subsequent to the commencement of the occurrence. In any event the vendor shall notify the purchaser of the delay within 48 hours of the commencement of the delay.

6. The vendor shall not let, assign or transfer this agreement or any interest therein, without the written consent of the purchaser and/or owner.

7. The vendor agrees to promptly pay for all materials and labor used, and when requested by purchaser and/or owner, will furnish waivers of lien from all sources providing materials or performing any work in connection with the supplying of the materials of this purchase order. In case any such lien is filed, the vendor will, at vendor's cost, secure a discharge or cancellation of the same and will reimburse the purchaser and/or owner for any loss, damage or expense it may incur in connection therewith.

8. The purchaser and/or owner and its representatives, shall have the right to inspect any and all portions of the items being purchased at all times and places during the progress of same. The vendor will provide sufficient, safe and proper facilities for such inspection

9. When requested by the purchaser and/or owner vendor will provide a qualified representative to attend meetings relative to this work and the total project at those times and places selected by the purchaser and/or owner.

10. Delivery shall not be deemed to be complete until goods have actually been received and accepted by purchaser and/or owner, notwithstanding any agreement to pay freight, express or other transportation charges, and the risk or loss or damage in transit shall be upon the vendor.

11. By executing this purchase order, the vendor verifies that he is familiar with and has knowledge of the complete set of contract documents including the plans and specifications, all of which are available at the office of Hermosa Construction Group

12. The vendor shall defend and save purchaser and/or owner harmless from all claims and liabilities for injuries to and/or death of, any and all persons or for loss of and/or damages to property caused in whole or part by the negligence or willful acts of vendor arising form the delivery, use, operation, or erection covered by this purchase order. All items provided by the vendor shall comply with any and all local, state, federal laws, rules or regulations, including safety codes, in effect at the time of shipment.

13. In the event of a breach or default of any provision of the order by the vendor, the vendor shall pay the purchaser and/or owner for any attorneys' fees and all other costs and expenses associated with the litigation as purchaser and/or owner may incur with respect thereto. All expenses incurred by purchaser and/or owner arising out of such breach or default, including any reasonable attorney fees and any other costs and expense arising out of such breach or default, including, but not limited to litigation.

14. Vendor represents that the goods covered by this order have been manufactured in accordance with the requirements of the Fair Labor Standards Act and all other applicable federal, state and municipal laws, rules and regulations.

15. If requested by the purchaser and/or owner and indicated herein, the vendor shall provide a performance and payment bond or a supply bond whichever is applicable duly executed with a surety company approved by the purchaser and/or owner and in form and contents in the amount acceptable to the purchaser and/or owner. If bond is required and same is not delivered to purchaser within prescribed time, this purchase order, at the sole discretion of the purchaser can be voided.

16. The contract shall be governed by and constituted according to the laws of the applicable state.

17. This contract may be modified or terminated orally, and no modification or termination nor any claimed waiver of any of the provisions hereof shall be binding unless in writing and signed by the party against whom such modification, termination or waiver is sought to be enforced.

18. Waiver of vendor's breach of default in any one particular hereunder shall not affect purchaser's and/or owner's rights with respect to other different or continuing breaches or defaults by vendor.

19. All negotiations and agreements prior to the date of this order are merged herein and superseded hereby there being no agreements and understandings other than those written and specified herein. In the event of conflict between any proposal of vendor specifically referred to herein and this order, and all matters or points not expressly covered by such proposal, the terms and conditions of this order shall govern  No custom or usage of any trade at variance with the terms and conditions of this order shall be binding.

20. Nothing contained herein or in any documents connected herewith shall be construed as limiting purchaser's and/or owner's other rights and remedies at law or in equity.

21. Days allowed by vendor for payment terms and discount terms shall be counted beginning with the date the invoices are received by Hermosa Construction Group.

22. Vendor will give adequate notice (but no less than 72 hours) to purchaser of delivery of materials so that necessary arrangements for receiving materials can be made.

23. Purchaser may offset against any sums due supplier/vendor under this purchase order, the amount of any obligations of the supplier/vendor to the purchaser either liquidated or unliquidated whether or not arising out of this contract.

From: Steve Farmer [mailto:sfarmer@hermosainc.com]
Sent: Monday, February 25, 2013 02:28 PM
Subject: Letter to USAID subcontractors

Case 1:13-cv-01984-RJL   Document 1   Filed 12/13/13   Page 10 of 12

EXHIBIT 2

February 25, 2013

USAID Project team,

As we have conveyed in prior communications, Hermosa Construction Group had experienced some difficulties surrounding the USAID Mobility Workspace project. These hardships translated into delayed payments to vendors and subcontractors on this project which we understand is of no fault to the affected subcontractors. We do not intend to make excuses for this situation, but we do desire to provide some clarity to the team as to how this situation occurred.

The USAID proposal and preconstruction effort was lead by two Hermosa staff members who are no longer with the firm. This was a competitively bid project and concessions were made in an effort to establish our first prime contract in the National Capital Region as a satellite office. Further, part of the bid strategy that was utilized by this former employee was to self perform portions of the demolition and interior build out work without weighing in availability and cost of resources in the local market. Historically, we have had the capacity to perform this type of work in our core operating region (the southeast). Additionally, and post award, a substantial business development fee was paid to a consultant who "assisted" Hermosa with introductions to GSA. Hermosa disputed this consultant's claim and negotiated a lower than original proposed number but did not want this issue escalated at the commencement of the project. Further, Hermosa utilized a teaming partner architect firm on the project in an effort to promote a dual working relationship for future Mobility Lab initiatives. In hindsight, the fee paid for the associated services could be viewed as out of balance.

Shortly after award, the project team found deficiencies in certain portions of the estimate and were left to make quick concessions in awarding these trades. The project team that was implemented on this project was lead by two new employees who are native to the DC market, but lacked corporate training with regards to Hermosa buyout and risk management practices. Given the short fuse to start the project as initiated by the client and the presence of the liquidated damages provision in Hermosa's contract, the project team advanced buy out and contracting efforts without internal approval and foresight as to the ramifications or recovery strategy downstream. Hermosa encountered a lead project manager change on the project and as a result of demands

1

from another DC project with the same agency. More inefficiencies and missteps occurred.

Further, Hermosa's Vice President of Operations exited the company in April of 2012, amidst the start up of this project, and quickly became unavailable. While the company immediately promoted an existing project manager to this role to fill the void of liaison between Atlanta and DC, many missteps and inefficiencies were experienced in how the project was bought out leaving Hermosa with a comprised profit margin early in the process.

Given Hermosa's unfamiliarity in working for GSA NCR and specifically, the USAID project, provisions were not made within the general conditions allocations to allow sufficient financial coverage for corporate staff and travel to accommodate the rigorous demands of the project. Hermosa chose to incrementally staff the project as the demands required in an effort to maintain a solid past performance rating with this new client and Mobility Workspace program. Change orders were presented along the way but sufficient general conditions and time extensions were not allowed by the client. Had the staff been more seasoned with Hermosa's corporate approach to this type of resistance, the outcome of each change order could have been more favorable to Hermosa.

Several key subcontractors experienced cash flow hardships throughout the project and were not sub-bonded by the new DC project team despite corporate policy requiring same for any subcontract over $100,000. Hermosa's project team made a decision to grant a significant change order to this subcontractor without a corresponding scope change, to accommodate a poor estimate by the sub and to avoid making a transition midstream. This decision was not approved by corporate management.

The company also experienced a CFO transition in mid-to-late 2012. This transition caused gaps in normal reporting activity within the company resulting in a loss of cost/payable visualization during a critical 90-day window in the middle of the project. This, along with the prior events only exacerbated the issue.

In the end, we are left with a substantial payable deficit on this project and a compromised profit position for 2012 as a company. We were able to substantially complete the job and maintained a strong performance reference specific to the efforts at the project site. We have dismissed all DC staff associated with the project and our corporate employee that was moved into the operational role following the vacancy by our former VP of Operations. We are left with a financial void to fill, an ability to procure and perform new work but an absence of immediate capital to solve the problem. The remainder of our active projects and staff are in good standing and we have narrowed our pursuit focus to projects that fit our core competencies.

Hermosa's intent is to ensure that all subcontractors are paid for the services provided on the USAID project. At the onset of the project, Hermosa procured payment and performance bonds to ensure project delivery to the GSA and payments to vendors and subcontractors.

Hermosa has communicated its payment issues with the GSA and has been working toward a resolution with the surety, Hanover Insurance Company, in an effort to effect expeditious payments to those affected subcontractors.

2

Attached, you will find copies of the payment and performance bonds that were issued by Hanover for this project if you wish to pursue accelerating payment through direct contact with them.

We would like to emphasize that Hermosa is very proud of this team in the delivery of the project to GSA, as is GSA with the quality of the project. We sincerely apologize for any inconvenience we may have caused related to payment issues.

Please contact me if you have any questions or require further information.

Best regards,


Steve Farrier
Controller
**Hermosa Construction Group - 8(a), SDB, MBE**

5525 Interstate Pkwy. North
Atlanta GA  30328
P: 678 564 3220 (main)
F: 678 564 3224

<u>www.hermosainc.com</u>

Also visit:  <u>www.third-lens.org</u>

3